**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-25-00046-CR**
_____

**RENALDO EARNEST DOTSON, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the Criminal District Court**
**Jefferson County, Texas**
**Trial Cause No. F22-40515**

**MEMORANDUM OPINION**

Isaiah Wagner ("Wagner") died from multiple gunshot wounds he received on January 30, 2022, in Jefferson County. A grand jury indicted Appellant Renaldo Earnest Dotson ("Appellant" or "Dotson") for Wagner's murder. Dotson pleaded "not guilty," but a jury found him guilty of first-degree murder and assessed his punishment at sixty-five years of confinement. *See* Tex. Penal Code Ann. § 19.02(b)(1). The trial court sentenced Dotson in accordance with the jury's verdict.

1

On appeal, Dotson challenges the sufficiency of the evidence supporting his conviction. We affirm the trial court's judgment.

Evidence at Trial

Testimony of Officer Nathan Hodges

Officer Nathan Hodges, a patrol officer with the Beaumont Police Department ("BPD"), testified that on January 30, 2022, he was "dispatched to a shots fired call[]" at the Beaumont Heights apartment complex in Beaumont. Officer Hodges recalled that he patrolled the complex, and at that time, the complex appeared to be quiet with no one outside, no one running away, and no vehicles leaving that caused him any concern. After ten to twenty minutes, he was flagged down and told that some vehicles had been shot. Other officers arrived at the scene to help investigate. According to Hodges, he was provided a general location for the vehicles, and after locating two of the vehicles, he discovered ten to twenty shell casings nearby. Officer Hodges testified that thirty to forty-five minutes later, an unidentified male approached him and advised him that a person was lying face down in another area in the complex. Officer Hodges recalled running with the other officers to the victim. Near Building C, he discovered a black male lying down on his stomach with a large pool of blood to the right of the victim. Hodges determined that the victim, later identified as Isaiah Wagner, was deceased, and Hodges notified his supervisor and EMS and secured the scene. According to Officer Hodges, it looked like someone

2

"had something out for Mr. Wagner[] [and it] looked like [Wagner] was being hunted just from the amount of shell casings that were observed[]" near Wagner's body. Officer Hodges recalled finding shell casings in between the locations where the vehicles were shot and where Wagner's body was located, indicating someone was being chased or followed. No gun was found on Wagner's body. The man who led Hodges to Wagner's body was never identified and left the scene.

Testimony of Officer Reginald Boseman

Officer Reginald Boseman with the BPD testified that he was dispatched to the apartment complex in reference to a shooting victim. Officer Boseman recalled that he was new to the job and was accompanied by a field training officer, Officer Alec Garcia. According to Boseman, the two vehicles that had been shot were randomly struck, and dispatch was unable to contact the owners of the vehicles. At the scene, Boseman observed Wagner lying in a pool of blood in front of Apartment 156 and surrounded by eight 9-millimeter shell casings and four .45 caliber shell casings. Boseman testified that nine 5.56 shell casings from an assault rifle were located a little further east from Wagner's body, and six 5.56 shell casings and three .45 caliber shell casings were located in the hallway near the laundry room of Building 4C. A red mask was found near the second story of Building 7C. Officer Boseman testified that, based on the pattern of the shell casings found and the position of Wagner's body on the ground, it appeared that Wagner was running as

3

he was being shot, and he did not see the shots coming towards him. Officer Boseman recalled that the area was taped off and law enforcement secured the scene and collected evidence, and he drafted a report. No firearms were recovered or seen at the crime scene.

Testimony of Amanda[1]

Amanda testified she was living at an adjacent apartment complex on January 30, 2022, and at least ten gunshots awakened her around midnight. According to Amanda, she could see the Beaumont Heights apartment complex from her second-story apartment, her apartment bordered the shared fence line with the Beaumont Heights apartment complex, and there was an opening in the gate along the fence line where one could pass from one complex to the other. She recalled looking out her second-floor window and seeing "two vehicles tak[ing] off at the same time" right after the gunshots.

Amanda stepped out onto her patio to see what was happening, and a police car arrived. She saw a woman without shoes walking from the scene at Beaumont Heights, through the gate opening at the fence line, and towards Amanda's apartment building. According to Amanda, the first officer she saw arrive at the scene crossed paths with the woman, and once the woman passed through the gate, Amanda asked

---

[1] Except for the Appellant, Appellant's co-defendants, the deceased, law enforcement personnel, and expert witnesses, we use pseudonyms to refer to the other witnesses.

the woman if the noise Amanda heard was gunshots. The woman, who appeared to be in distress, answered, "Yes[,]" and asked if she could come up to Amanda's apartment. Amanda thought she was helping the woman and told the woman she could come to Amanda's apartment. The woman came upstairs to Amanda's apartment and was out of breath; the woman stayed on the phone with a person that Amanda believed was the woman's mother, and the woman tried to explain where she was. Amanda spoke to the woman's mother as well, trying to help the woman's mother understand directions to pick up the woman. Amanda asked the woman what happened, and the woman responded that she was throwing out the trash and trying to get away from the gunshots. Amanda assured the woman that they were safe because Amanda had her own gun in the apartment, and then the woman pulled out a gun and stated, "I do too." Amanda was scared because there had just been a shooting, and the woman was in her home with a gun, and Amanda realized quickly that letting her into the apartment "was not the best move." At trial, Amanda described the woman's gun as an "[a]utomatic" and "two-tone gun, dark brown and light brown." Amanda agreed that in her statement to law enforcement, she described the gun as two-tone, tan and black. Amanda testified that the woman reassured her that the gun had not been used and offered for Amanda to touch it to confirm it was not hot and had not been recently fired. Amanda recalled that she found this odd, but that she touched the gun, and the next day she regretted doing so when someone

5

alerted her that her fingerprints would now be on the gun. The woman left Amanda's apartment after about ten to fifteen minutes.

A couple of days later, she "Googled" the shooting online and saw a picture of the same woman who was in her apartment and realized the woman was a person of interest in the shooting. Amanda testified she panicked, and the following day she went to the police department and gave a statement. A photograph of the woman Amanda identified as being in her apartment after the shooting was admitted into evidence. Amanda's statement was admitted into evidence and published to the jury. At trial, Amanda testified she was ninety percent sure the woman in her apartment was the one in the photograph identified as a person of interest. Amanda did not see the shooting and did not know the name of the woman who came to her apartment. Amanda testified she had never seen Dotson prior to the trial.

Testimony of Erika Sauceda

Officer Erika Sauceda with the BPD testified that she was on patrol and dispatched to the Beaumont Heights apartment complex in response to shots being fired. Sauceda recalled that she did not see any vehicles leaving or anyone running away. A recording from Officer Sauceda's body camera from that night was admitted into evidence and published to the jury. Officer Sauceda testified that the recording showed that initially someone in a red shirt flagged them down, and then

6

they located Wagner's body. According to Sauceda's report, no gun was recovered from the scene. Sauceda helped secure the scene and mark evidence.

Testimony of Robert Rector

Robert Rector, a BPD officer, testified that he was dispatched to the scene to map out computerized diagrams of the scene and evidence. These diagrams were admitted into evidence.

Testimony of Katie

Katie testified that she was the manager at Beaumont Heights at the time of the shooting. According to Katie, some residents and a BPD dispatcher called her to notify her of the shooting. She contacted the complex's maintenance man, who lived onsite, and asked if he could check to see what was going on before she arrived there. Katie recalled that the maintenance man was the first to find Wagner's body. A recording of the apartment complex's surveillance footage from that night was admitted into evidence and published for the jury. According to Katie, Wagner was not a resident of the complex. Katie identified the man in the red shirt from the surveillance video as the complex's maintenance man who found Wagner deceased, and the police interviewed the maintenance man.

A day or two after the shooting, after Mychelle Cole was apprehended, Cole's family called Katie and told Katie that they would not be returning to their unit in the complex, and they asked Katie to secure the unit. Katie found bullets on the

windowsill in Mychelle Cole's apartment, apartment number 276C, which is near the laundry room, and Katie contacted law enforcement to have them collect the evidence.

Testimony of Lieutenant Andre Reynolds

Lieutenant Andre Reynolds with the BPD testified that on the night of the shooting, he was a sergeant and assigned to patrol. He arrived at the scene shortly after Wagner's body was found and supervised the officers at the scene. Reynolds testified that the scene was "violent" and "large in scale." Reynolds recalled locating three more shell casings that had not been discovered before his arrival. According to Reynolds, Detective Wilson identified the deceased as Wagner. A total of four or five vehicles were damaged by gunshots and based on the locations of the shell casings discovered and Reynolds's training and experience, it appeared the shooting began at one point, continued when Wagner began running and ended where Wagner's body was located. Lieutenant Reynolds recalled that the physical evidence at the scene indicated that multiple weapons of varying calibers were used to shoot at Wagner; Wagner attempted to get away from the situation and died from multiple gunshot wounds.

Testimony of Tina

Tina testified that Wagner was her boyfriend for more than two years. According to Tina, in January of 2022, she and Wagner broke up, and she was

"trying to get away from the relationship[,]" but they still loved each other. She had not been dating Kedrain Perkins very long, but Perkins would sometimes stay the night with her and borrow her car, a 2011 gray Hyundai Sonata. Tina testified that she knew Dotson as "Ernie." She was told that Dotson was Perkins's cousin, and Dotson came to her house sometimes with Perkins. She identified "Ernie" at trial as the defendant. According to Tina, she was unaware of any conflict between Perkins and Wagner before she began dating Perkins. Wagner was not taking it well that Tina and Perkins were dating, which created some conflict.

Tina testified about another shooting on January 24, 2022, on Grand Street involving Wagner, Perkins, and Dotson. Tina recalled that about 5 a.m. on January 24, 2022, Wagner broke into her home on Jirou Street in Beaumont, and he was in her room asking "where is [Perkins's] gun[?]" trying not to wake Perkins, who was there sleeping. After Tina "mouthed" to Wagner to "get out[,]" Perkins woke up. Wagner ran downstairs, told Tina he had clothes upstairs, and then left Tina's apartment. Perkins used Tina's car "all day," and he was going to have repair work done to the car by a family member. Tina later overheard a conversation between Dotson and Perkins when one of them "stated how []they shot at [Wagner]." Tina testified that either Dotson or Perkins talked about how Wagner had run away, was "sliding all in the mud[,]" and was trying to avoid the gunshots. Tina testified that although both Dotson and Perkins talked about it, she could not remember who made

9

the statement, and Tina did not know for sure if Dotson was at the shooting. Tina testified that she believed, based on the conversation she overheard, that both Dotson and Perkins were there. Tina agreed that she later told law enforcement that Dotson had made the statement about watching Wagner slide in the mud while being shot at, and that Dotson was at the shooting on Grand Street on that date. According to Tina, she was not aware if Dotson had any "beef" with Wagner, and she did not think Dotson knew Wagner at that point. According to Tina, although her car was identified at the scene, law enforcement interviewed her, and she was cleared of any involvement. Tina also consented to law enforcement searching her vehicle.

Tina recalled that on the night of January 30, 2022, Perkins had Tina's car. Tina testified that she had been at home the first part of the day but rode with a friend to Houston and returned home around midnight. When she got home, she could not get into her house because no one was there, and her house key was on the key ring that Perkins had. She was upset because she could not get inside her home, and she called Perkins to see where he was. She recalled asking him to come back home, and he arrived around 1:00 a.m. with Dotson in the vehicle. She testified that they took food to Perkins's aunt and came back to Tina's home. Tina recalled that on the way home, she became upset when she observed a pair of women's slippers that were not hers in the backseat of her car, and she asked to whom the slippers belonged. Perkins told her they were his aunt's, and when Tina asked why he did not drop the slippers

10

off when he had just dropped the food off, Perkins replied that the slippers belonged to a different aunt. According to Tina, the three of them went to sleep at her house, and neither Perkins nor Dotson seemed upset. Perkins and Dotson left the next morning in Tina's car. Later, on January 31, 2022, Tina learned of the shooting at Beaumont Heights when her mother called, and Tina panicked. Tina testified that she had to go to the police station to prove that she was not in the area at the time of the shooting and that she had gone to Houston. Tina recalled that neither Dotson nor Perkins ever came back to her house.

Testimony of Michelle Ceja

Michelle Ceja, a BPD crime scene technician, testified that she responded to the crime scene at Beaumont Heights and collected evidence and took photographs. Ceja described how certain exhibits were taken from the scene and how evidence was collected and sealed into envelopes, and the specific case number of the case was placed on the envelopes, and initialed and dated by her. Some evidence collected by Ceja and admitted at trial included live rounds, bullet fragments, different shell casings found at the scene—eight .45s, nineteen 9 millimeters, and eighteen .223s, ten scans of swabs collected at the scene, as well as photographs of Wagner at the crime scene, photographs of bullet casings from the crime scene, photographs of different vehicles damaged at the scene, as well as other photographs of the scene and the evidence collected.

On cross-examination, Ceja testified that she attempted to get latent prints off a Twisted Tea can found at the scene, but the result was negative, and that the mouthpiece of the can was also swabbed. To her knowledge, no one tried to get latent prints off any spent shells found at the scene.

Testimony of Carol Hargroder

Carol Hargroder, a BPD ID tech who assisted Ceja, testified that once she arrived on scene, she and Ceja "divided [the scene] in half[]" and each looked for evidence, marking evidence, taking photographs, and collecting evidence. Photographs taken by Hargroder of the scene were admitted into evidence.

Testimony of Brandi Dyson

Brandi Dyson, who works for the BPD crime scene unit, testified that on February 1, 2022, she met with Detective Heather Wilson in reference to processing an iPhone collected from the scene for fingerprints and DNA. According to Dyson, she performed swabs on the phone and tried to obtain latent fingerprints. She was successful in obtaining latent fingerprints, and she entered the prints into a state-wide fingerprint identification database, and the database determined Wagner was a match to the fingerprints.

According to Dyson, she also received from Ceja forty-five shell casings—eight .45 casings, eighteen 9-millimeter casings, and nineteen .223 casings. Dyson testified she entered information for one casing for each different caliber into a

national database system that collects images of casings and information from guns, and a report is generated and sent back to the detectives.

Dyson recalled that on February 4, 2022, she was dispatched to Apartment 276C at Beaumont Heights to help collect evidence and take photographs for a search warrant detectives were executing. Dyson testified she collected two GFL .357 SIG bullets from the bedroom windowsill of Apartment 276C, one Taurus 9-millimeter gun from the kitchen cabinet, a pink purse with contents, a black drawstring bag with contents from the bedroom, a red jacket, red and black pajama pants, and an iPhone. Dyson entered the items into the property log at BPD. According to Dyson, there were eleven 9-millimeter bullets in the Taurus. Photographs of the bullets from the apartment and the Taurus were admitted into evidence. She swabbed the gun, the trigger, and the handle of the Taurus and logged it into the BPD property office, but she was unaware if it was ever sent off for testing. She testified that she was unaware whether any personal items that she collected from the apartment were ever sent off for testing.

Testimony of Officer Ryan Flanigan

Ryan Flanigan, a BPD patrol officer in 2022, testified that on January 31, 2022, he was dispatched to an area of Beaumont to look for a gray Hyundai Sonata that the department had been actively looking for in connection with a homicide. According to Flanigan, while he looked for the car, he was notified it was found at

13

a hotel, and detectives were already there. Flanigan identified State's Exhibit 13 as photographs of the car that they located. Flanigan testified that Perkins and Dotson were inside the vehicle when it was stopped, and although he could not testify as to whether the defendant at trial was Perkins or Dotson, he knew he was one of those two individuals. Flanigan recalled that he transported Perkins to the police station, and the car was towed and taken into evidence.

Flanigan testified that before locating the car, he had also been dispatched to a shooting that occurred on January 24, 2022, when Wagner reported he was shot at, and Flanigan helped look for a Hyundai Sonata that was the suspect's vehicle in that incident. Flanigan completed a report on the incident of January 24, 2022, and Wagner was the victim. According to Flanigan, his report indicated that Wagner only brought up Perkins's name as a suspect in that incident and he did not mention Dotson. Flanigan's report also reflected that thirty-three 9-millimeter shells, seven .45 shell casings, and six .40 caliber shell casings were collected from that January 24th incident. Flanigan testified that the Hyundai Sonata in that case and the Hyundai Sonata they located on January 31, 2022, were similar, so the incidents could have been related.

Testimony of Detective Jason Torres

Detective Jason Torres with the BPD testified that he was called out to the Heights Apartments at 4 a.m. on January 31, 2022, and he was tasked with getting

14

information on the deceased victim. Detective Torres recalled that he began to look for the victim's car, a silver 2009 Hyundai Sonata with paper tags, and Katie, the apartment complex manager, told law enforcement that she had some black-and-white surveillance videos of a vehicle matching the Hyundai's description. The videos were admitted at trial and published to the jury. According to Torres, law enforcement determined that the shooting had occurred around 11:57p.m. on January 30, 2022, and portions of the videos show a Hyundai Sonata drive through the complex that night around 11:26 p.m. Then at 11:53p.m., a Hyundai Sonata backs into a parking spot with headlights on, and a person is seen getting out and walking through the apartment complex. According to the video footage, the vehicle remained parked for several minutes. A person can be seen getting back into the vehicle, and the vehicle leaves the apartment complex at approximately 12:13 a.m. on January 31, 2022. Detective Torres testified that other unidentified individuals were in the background of the videos. Later, Wagner's car was located at a different apartment complex nearby, and it was towed and processed at the Jefferson County Crime Lab. During Detective Torres's investigation, he heard that at least three people were involved in Wagner's murder and that some were wearing masks. Detective Torres recalled that on January 31, 2022, a traffic stop was initiated on a 2011 Hyundai Sonata, and Dotson and Perkins were inside the car.

15

Detective Torres testified he obtained a lead on a potential female suspect in Wagner's murder, Mychelle Cole, and that she lived in Apartment 276C at Beaumont Heights. Detective Torres prepared a search warrant for Cole's apartment and drafted search warrants for the 2011 Hyundai Sonata and for Perkins's and Dotson's cell phones. Detective Torres identified Dotson as the defendant at trial.

Testimony of Detective Nick Thompson

Detective Nick Thompson with the BPD testified that he was dispatched to assist at the scene after the shooting. According to Detective Thompson, he observed Wagner deceased on the ground and near Apartment 156C. Detective Thompson obtained an SD card from a camera at a nearby apartment pointing in the direction of Wagner's body, but the Detective was unable to obtain footage from the SD card. He also spoke with a tenant at the nearby Lexington complex who had a Ring doorbell camera, but Thompson learned that the subscription had expired, and no data was recorded in the system. Detective Thompson contacted Katie, the manager of Beaumont Heights, who advised that the complex had cameras that collected footage, but she was not on-site at that time.

Through the investigation, Detective Thompson learned that Wagner's ex-girlfriend, Tina, had a boyfriend named Kedrain Perkins and that Tina and Kedrain could be traveling in a Hyundai Sonata with a Louisiana license plate. Detective Thompson recalled that he obtained an address for Tina, went to that address, and

16

located a vehicle like the description of the car at that apartment complex, and it had a Louisiana license plate. According to Thompson, he observed two black males enter the vehicle and leave the complex, and Thompson and other patrol units followed the car. Another patrol unit initiated a traffic stop around noon or 1:00 p.m. on January 31, 2022. Thompson pulled up to the location where the car was stopped, and the two individuals in the car—identified as Kedrain Perkins and Renaldo Dotson—were detained. Detective Thompson identified the defendant at trial as Renaldo Dotson. Detective Thompson helped escort the Hyundai Sonata to the crime lab, and he transported a buccal swab collection kit that he assumed had swabs of Perkins and Dotson to the crime lab.

On February 2, 2022, Detective Thompson located a Hyundai Sonata matching the description he was given, which was registered to Wagner, at an apartment complex near the Beaumont Heights complex. Thompson had the car towed to the Jefferson County Crime Lab.

Testimony of Memling Altamirano

Memling Altamirano, a forensic scientist for the Jefferson County Regional Crime Lab, testified that in early February 2022, she processed and analyzed the evidence from a 2011 Hyundai Sonata in response to a search warrant. Altamirano found a live round in the trunk and a copper fragment underneath the hood liner, and those items were transferred to the firearms section of the crime lab for analysis.

17

According to Altamirano, from the car she collected clothing, a ski mask, a couple of lighters, a gun holster, and a pair of slippers. Altamirano testified that, because DPS's policy only allows ten items for DNA testing, it was decided that the following items from the car which she processed and items from another car would all be sent in for testing: blood card from Isaiah Wagner; a cutting from a gray hoodie; two buccal swab collection kits—one from Kedrain Perkins and one from Mychelle Cole; latent DNA swabs from the front passenger's side seat; latent DNA swabs from the rear passenger side seat; latent DNA swabs from Gatorade bottles found in the vehicle and a green tea bottle found underneath the driver's seat; a gun holster; a ski mask; a receipt that had gum attached to it from the front's passenger's side floorboard; and the buccal swab from the tow truck driver which is performed as protocol when a tow truck driver delivers a car to the crime lab for processing at the Houston crime lab. In March of 2022, she analyzed clothing from the 2011 Hyundai Sonata but determined there was no blood on the clothing.

Testimony of Steve Mayes

Steve Mayes, the director of the Jefferson County Crime Lab, testified that he analyzed the victim's car, a 2009 Hyundai. Mayes also sent bullets and bullet fragments extracted from the car's body to the firearms division for testing. Mayes also removed and analyzed a stained gray hooded sweatshirt from the trunk of the car.

18

Testimony of Amanda Domer

Amanda Domer, a forensic scientist with the Texas Department of Public Safety crime lab in Houston, testified that she compared the DNA from evidence submitted with known DNA samples from Wagner, Perkins, Cole, and the tow truck driver. The tow truck driver's profile was excluded from all the evidence items. As for the gray hooded sweatshirt from Wagner's car, Wagner was included as a possible contributor to the DNA profile, while Perkins and Cole were excluded. According to Domer, Perkins and Cole were not included in the possible contributors to the DNA profile of the evidence analyzed, except that, as for the latent swab from the green tea, Domer did not exclude Mychelle as a contributor but instead stated that the likelihood of Mychelle being a contributor was the same as some unknown person being a contributor.

Testimony of Dr. William McClain

Dr. William McClain, a forensic pathologist and medical examiner, testified that Dr. Selly Strauch Rivers performed Wagner's autopsy and completed an autopsy report. According to Dr. McClain, Dr. Rivers's report concludes that thirty-one-year-old Wagner died from gunshot wounds, and the manner of death was homicide. Dr. McClain testified that Dr. Rivers found that Wagner suffered many gunshot wounds, and Dr. Rivers removed bullets and bullet fragments from Wagner's body as well as

19

bullets entangled in Wagner's clothing. Photographs from the autopsy were admitted into evidence and published to the jury.

Testimony of Anessa Barnette

Anessa Barnette, a BPD crime scene technician, testified that on February 1, 2022, she was called out to the Jefferson County Morgue to photograph Wagner during his autopsy. According to Barnette, Wagner had twenty-three bullet holes in his body. She photographed and collected the bullet fragments located by the medical examiner and entered them into the BPD property room. Exhibits 214 through 224, the bullet fragments, were admitted into evidence.

Testimony of Officer Chase Ratcliff

Chase Ratcliff, an officer with the BPD, was dispatched on January 24, 2022, to Grant Street in reference to shots being fired. Officer Ratcliff encountered Wagner at the scene, and there were forty-seven or forty-eight shell casings in the street from guns of different calibers—a .40 caliber, .45 caliber, and 9-millimeter.

Testimony of Samantha

Samantha testified that on January 30, 2022, she lived in the Beaumont Heights apartment complex and had a security camera set up outside her apartment. The security system was working on the night of the shooting, and the footage was admitted into evidence as State's Exhibit 225.

Testimony of Detective Ronnie Freeman

Ronnie Freeman, a detective and forensic analyst for the BPD, testified that he completed forensic examinations of Perkins's and Dotson's cell phones for this case using extraction software. Detective Freeman recalled that the phones were collected by a search warrant. Detective Freeman prepared digital forensic examination reports for the phones. Detective Freeman's analysis showed that Perkins and Dotson contacted each other "quite a few" times from January 19, 2022, through January 31, 2022. As to the timeframe surrounding Wagner's murder, Detective Freeman's analysis specifically indicated that Perkins and Dotson exchanged calls with several conversations after 11 p.m. on January 30, 2022, and into the morning of January 31, 2022.

Testimony of Detective Phillip Smith

Detective Phillip Smith with the BPD testified that, as a result of investigating Wagner's murder, he conducted a traffic stop on a 2011 Gray Sonata on January 31, 2022. Detective Smith recalled that Kedrain Perkins and Renaldo Dotson were in the vehicle. They were arrested, taken to the police station, interviewed, and their phones were obtained with search warrants. In their interviews, they provided background information, including their phone numbers.

Detective Smith testified that through the firearms database, he received a lead about the collection of a .45 caliber casing that came from the scene of Wagner's

21

murder, and it connected to a prior shooting that had occurred on January 24th on Grand Street, which also involved Wagner as the victim. According to Detective Smith, he received another lead when an AR-15 .223 caliber firearm was recovered on February 11, 2022, and the firearm matched a shell casing from the Wagner murder scene. Detective Smith testified that the firearm was recovered from a scene that involved Dotson and another individual as suspects. The firearm and the shell casing were submitted to the Jefferson County crime lab, but the results were "inconclusive."

Detective Smith testified that based on the summary of the phone calls between Perkins and Dotson made on the night of the murder and a message on Perkins's phone showing Mychelle Cole had called him about one hour before the murder, and based on Smith's training and experience, Detective Smith believed that Perkins and Dotson worked together in carrying out the homicide, that their phone calls to each other before and after the shooting show that they were trying to find Wagner in the complex, and that Perkins was directing Dotson to locate Wagner, and Perkins was in contact with Mychelle Cole. Detective Smith testified that the surveillance video that captured Wagner's murder showed at least three individuals involved, and based on Smith's experience and training, those individuals acted intentionally and knowingly together to kill Wagner. Detective Smith recalled that

Perkins said that Dotson was in the parking lot when the shooting occurred, and later Perkins admitted to trying to kill Wagner on a prior occasion.

Testimony of Detective Heather Wilson

Detective Heather Wilson with the BPD testified she was called out to assist at the scene on the night of the murder. She described the crime scene as large and testified that around forty-five shell casings were found. She was also aware of the shooting on January 24, 2022, where Wagner was shot at near his home in which around forty-six shell casings were found. Detective Wilson recalled that she was one of the people who identified Wagner as the deceased victim of the murder, and she ran his name through their database and confirmed Wagner's identity through distinguishing tattoos.

According to Detective Wilson, law enforcement learned that Wagner and Perkins both were interested at some point in the same two women—Mychelle Cole and Tina—and that caused a conflict between Wagner and Perkins, like a "jealousy kind of love triangle-type situation." Based on this information, Detective Wilson went to Tina's apartment on Jirou Street, and she observed a Hyundai Sonata with a Louisiana license plate leaving the parking lot.

After the traffic stop of Perkins and Dotson on January 31, 2022, Wilson attended Perkins's and Dotson's interviews. According to Wilson, Perkins and Dotson were each provided *Miranda* warnings before their interviews. Wilson

23

recalled that during Perkins's interview, as to the January 24, 2022, shooting of Wagner, Perkins admitted to providing Wagner's location and a vehicle to a group of guys to kill Wagner. Perkins denied involvement in Wagner's murder and denied being at Beaumont Heights on the night of Wagner's murder. Wilson testified that during Dotson's interview, he stated that he had been staying with Perkins and Tina, but he denied any kind of involvement in Wagner's murder and denied being at Beaumont Heights on the night of Wagner's murder.

Detective Wilson was also involved with obtaining a search warrant for Perkins's cell phone on February 3, 2022. After Perkins's arrest, Wilson was present for law enforcement's second interview of Perkins. According to Wilson, Perkins initially denied being at Beaumont Heights on the night of Wagner's murder, but after being confronted with GPS locations provided from Perkins's cell phone, Perkins admitted he was at Beaumont Heights that night. Perkins confirmed that Mychelle Cole lived in Apartment 276C. Perkins stated that he was walking down the complex stairs and passed Wagner going up the stairs, but that there were no issues. Detective Wilson testified that Perkins gave verbal and written consent for law enforcement to obtain a buccal swab before the interview was finished.

Detective Wilson recalled that Mychelle Cole was arrested on a murder warrant on February 8, 2022, for Wagner's murder, and Cole was interviewed. In Cole's interview, she did not make any admissions about Wagner's murder.

24

Detective Wilson was advised that they needed another interview of Cole. After the second interview with Cole's attorney present, law enforcement obtained an arrest warrant for Dotson on August 18, 2022, for Wagner's murder. According to Detective Wilson, Dotson was arrested and, although he agreed to another interview, he did not say much and requested a lawyer and the interview was terminated.

Wilson testified that several conversations and photos were discovered on Perkins's phone that she thought were relevant to Wagner's murder based on the content and dates, and those were admitted into evidence. A text message exchange was extracted from Perkins's phone which was a text message from January 25, 2022, with a photo showing Perkins with the 2011 gray Hyundai Sonata. Detective Wilson explained that the photograph was significant because it showed Perkins with the car that Dotson and Perkins were in at the time of the January 31, 2022, traffic stop. According to Wilson, the photograph does not show a bullet hole in the hood of the car, but when the traffic stop was made on January 31st, a bullet hole was observed in the hood of the car. Wilson testified that the extraction from Perkins's phone also revealed through Instagram that there was a conversation between Perkins and Cole on January 30, 2022, and the phone also showed on that date Perkins called Cole at 10:47 p.m. and spoke to Cole for about twelve minutes. Also discovered from the search of Perkins's phone, the police found a social media private message between Perkins and another individual that started on January 10,

25

2022, and then continued with a message on January 24, 2022, asking, "You got sum 45 bullets." Detective Wilson explained that this was important because later that same day Wagner was shot at on Grand Street, and the assailants used a .45 caliber bullet in that shooting, and in Wagner's murder. Another conversation which was extracted from Perkins's phone involves an inquiry about obtaining some 9-millimeter caliber ammunition. Another photo on the phone was of Perkins with an "AR-15 style[]" firearm that typically shoots .223 caliber bullets, and then there was a January 26, 2022, to January 27, 2022, conversation about buying a "street sweeper[]" which is street terminology for a firearm.

Detective Wilson agreed that during her investigation, she spoke to Perkins's aunt, who was in contact with both Cole and Perkins the night of the shooting. According to the aunt, she picked Cole up from a bar across from Beaumont Heights at Perkins's request, and all three of them ended up at Apartment 204 in another complex. Wilson explained that Dotson was a neighbor and lived at Apartment 205 at that same complex.

Testimony of Detective Aaron Lewallen

Detective Aaron Lewallen with the BPD testified he is trained to import cell phone data from cell phone companies into a software-based program that provides where the cell phone is or was at certain dates and times. Detective Lewallen recalled that he used this program for two cell phone numbers related to this case. According

to Detective Lewallen, running the phone's data through the software program revealed that, based on numerous calls utilizing the cell tower, Dotson's phone pinged to the cell tower that serviced the area that included Beaumont Heights from 11:00 p.m. to about midnight on January 30, 2022, and Perkins's phone also utilized the same cell tower at 11:58 p.m. the same night. Detective Lewallen's investigation determined that Perkins's phone was also pinging the cell tower for Grand Street on January 24, 2022, at 10:45 a.m.

Testimony of Hunter Jones

Hunter Jones, a firearms examiner at the Jefferson County Crime Lab, testified that he received evidence from the January 30, 2022, murder of Wagner and from the January 24, 2022, aggravated assault. Jones was asked to compare the casings and projectiles of both. According to Jones, he determined that at least four distinct weapons fired the shell casings in Wagner's murder, and there were at least three different calibers of firearms that fired the projectiles. He explained that he would need each firearm to determine exactly which firearm fired each casing. Jones testified that for the shooting on January 30, 2022, there were casings from two separate 9-millimeter weapons, as well as casings fired from a .45 caliber weapon. In Jones's expert opinion and through a microscopic examination and looking at toolmarks in the "rifling" or the "land and grooves," he concluded that the same .45 caliber firearm was used in both the January 24, 2022, aggravated assault of Wagner

27

and the January 30, 2022, murder of Wagner, but he was unable to determine the manufacturer or model of that firearm. Jones could not say if the .223 casings they found at both shootings were fired from the same weapon in both shootings. According to Hunter, none of the casings he examined were fired from the Taurus 9-millimeter they obtained from Cole's apartment.

Testimony of Mychelle Cole

Mychelle Cole testified that she was arrested and charged with Wagner's murder. According to Cole, she entered a plea of guilty to manslaughter, but at the time of trial, she had no plea agreement, and she had not been promised anything in exchange for her testimony. Cole recalled that she was interviewed about two or three days after Wagner's murder, and she identified Isaiah Wagner, Kedrain Perkins, and "Ernie" Dotson in photographs provided by law enforcement. Those identifications with her handwriting on them were admitted at trial. Cole identified the defendant at trial as Dotson. She testified she met Dotson through Kedrain. Cole stated that, at the time of Wagner's murder, she was romantically involved with both Wagner and Perkins. According to Cole, she had learned that Perkins and Cole's friend, Tina, were romantically involved, so she had kicked Perkins out of her apartment. Her apartment number was 276C at Beaumont Heights.

Cole testified that she did not know anything about the shooting on January 24, 2022, on Grand Street, and she never heard Perkins or Dotson make any

admission as to any involvement in that shooting. Cole recalled that before the shooting on January 30, 2022, Wagner and Perkins had an ongoing disagreement, and they were not friends. According to Cole, she did not know if Wagner and Perkins knew that she was romantically involved with both of them. She testified that she was trying to conceal it from them.

Cole recalled that on the day of Wagner's murder, Wagner had come to see Cole at her apartment. They were cooking, and Wagner wanted to smoke marijuana, so Cole made him go outside to smoke, but she went with him because she "knew what was going to happen[] and [] wanted to stop it from happening." According to Cole, she did not know that Wagner would be killed that night, but she had talked earlier that day with Perkins, and the plan was for Cole to get Wagner to come to her apartment. Cole stated that Wagner would often park at another nearby apartment complex and walk to her apartment because he had relatives who lived at the nearby complex. Cole testified that Perkins called Cole to confirm Wagner was there. When Wagner walked outside Cole's apartment to smoke, Cole followed him, and she was trying to stop him from going downstairs and almost caught up with him. Cole recalled that when they were walking down the stairs, she heard a lot of gunshots, and Wagner said, "Go." Cole testified that she "froze" on the staircase because she was in shock, and then Wagner ran away. Cole testified that after Wagner started running away, Cole recognized Perkins by his walk. She also recognized Dotson,

29

and she saw four or five people. She testified she saw one big gun and some other guns, but she could not recall who held which guns, although she remembered seeing both Perkins and Dotson with guns in their hands. She recalled that one of the guns looked like Exhibit 233, but she could not remember who had it.

According to Cole, once she saw the guns and heard all the shots, she expected to die with Wagner. She testified that she ran from her apartment, lost sight of Wagner, went towards a lady who was standing outside, and ended up at the Lexington Apartments, where she called her mother to come get her. Cole recalled that the lady at the Lexington Apartments invited her into an apartment, and Cole showed the lady the Taurus gun she had just to put the lady at ease; Cole also told her that she could have it, and it had not been used. Cole was barefoot and the lady gave Cole some slippers. Cole testified that her mother arrived, but Cole said she was too scared to leave with her mother, and she made her mother leave without her. She stated that she did not remember if she saw Perkins or Dotson later that night. Cole recognized Exhibit 13 as Tina's car but did not remember if she saw Perkins driving Tina's car that night. She also did not know who Perkins was with before the shooting.

When Cole was shown Exhibit 225, one of the doorbell cam videos admitted into evidence, Cole said she had never seen the video, but she testified she recognized Perkins and Dotson in the video by their walk. Based on the video, Cole

remembered that Dotson had the big, long gun and wore a mask, and Perkins walked behind him with a gun.

Cole testified that she felt uncomfortable about testifying. Cole admitted that she told Perkins that Wagner was going to be at her apartment, and she knew that what happened could happen. She testified that she had second thoughts and tried to stop it. Cole recalled that a few days after Wagner's death, law enforcement was looking for her, and she went to the police station. She provided a statement to law enforcement. She also turned over one of her phones to the police. She agreed that she never mentioned Ernie's (Dotson's) name in her five-page statement that she provided to the police. She was arrested for murder, but she pleaded guilty to manslaughter as part of her plea bargain.

Standard of Review and Applicable Law

We review the sufficiency of the evidence in the light most favorable to the verdict to determine whether a rational factfinder could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). We give deference to the factfinder's responsibility to fairly resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Hooper*, 214 S.W.3d at 13 (citation omitted). If the record contains conflicting inferences, we must presume that the factfinder resolved such conflicts

in favor of the verdict and defer to that resolution. *Brooks v. State*, 323 S.W.3d 893, 899 n.13 (Tex. Crim. App. 2010); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). While a jury is permitted to draw reasonable inferences from the evidence, it is not permitted to draw conclusions based on speculation or factually unsupported inferences or presumptions. *See Hooper*, 214 S.W.3d at 15. The jury as factfinder is the sole judge of the weight of the evidence and credibility of the witnesses, and it may believe all, some, or none of the testimony presented by the parties. *See Febus v. State*, 542 S.W.3d 568, 572 (Tex. Crim. App. 2018); *Heiselbetz v. State*, 906 S.W.2d 500, 504 (Tex. Crim. App. 1995).

We also "'determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict.'" *Clayton*, 235 S.W.3d at 778 (quoting *Hooper*, 214 S.W.3d at 16-17). "Direct and circumstantial evidence are treated equally: 'Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt.'" *Id.* (quoting *Hooper*, 214 S.W.3d at 13). Each fact need not point directly and independently to the defendant's guilt, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *Temple v. State*, 390 S.W.3d 341, 359-60 (Tex. Crim. App. 2013) (citations omitted); *Hooper*, 214 S.W.3d at 13; *Johnson v. State*, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993).

32

Article 38.14 of the Texas Code of Criminal Procedure provides that "[a] conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense." Tex. Code Crim. Proc. Ann. art. 38.14. When conducting a sufficiency review of the non-accomplice evidence under article 38.14, we eliminate the accomplice testimony and examine the remaining portions to determine if there is any evidence that tends to connect the defendant to the commission of the offense. *Smith v. State*, 332 S.W.3d 425, 442 (Tex. Crim. App. 2011); *Solomon v. State*, 49 S.W.3d 356, 361 (Tex. Crim. App. 2001). "The direct or circumstantial non-accomplice evidence is sufficient corroboration if it shows that rational jurors could have found that it sufficiently tended to connect the accused to the offense." *Smith*, 332 S.W.3d at 442 (citation omitted); *see also Simmons v. State*, 282 S.W.3d 504, 508 (Tex. Crim. App. 2009) (citation omitted). When reviewing the sufficiency of non-accomplice evidence under 38.14, we decide whether the inculpatory evidence tends to connect the accused to the commission of the offense, and the sufficiency of the evidence is judged according to the particular facts and circumstances of each case. *Smith*, 332 S.W.3d at 442. No particular amount of corroborating evidence is required for sufficiency purposes. *Malone v. State*, 253 S.W.3d 253, 257 (Tex. Crim. App. 2008).

33

"'Tendency to connect' rather than rational sufficiency is the standard[;] the corroborating evidence need not be sufficient by itself to establish guilt." *Solomon*, 49 S.W.3d at 361 (citation omitted). "The corroborating evidence need not directly link the defendant to the commission of the crime." *Ary v. State*, Nos. 09-19-00244-CR & 09-19-00245-CR, 2020 Tex. App. LEXIS 8668, at *56 (Tex. App.—Beaumont Nov. 4, 2020, pet. ref'd) (mem. op., not designated for publication) (citing *Vafaiyan v. State*, 279 S.W.3d 374, 385 (Tex. App.—Fort Worth 2008, pet. ref'd)). There simply needs to be other evidence tending to connect the defendant to the crime. *Id.* When there are conflicting views of the evidence, we defer to the factfinder's resolution of the evidence. *Smith*, 332 S.W.3d at 442; *Simmons*, 282 S.W.3d at 508.

A person commits murder if he "intentionally or knowingly causes the death of an individual[.]" Tex. Penal Code Ann. § 19.02(b)(1). "Murder is a 'result of conduct' offense, which means that the culpable mental state relates to the result of the conduct, i.e., the causing of the death." *Schroeder v. State*, 123 S.W.3d 398, 400 (Tex. Crim. App. 2003) (citation omitted). A person acts intentionally with respect to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result. Tex. Penal Code Ann. § 6.03(a). A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result. *Id.* § 6.03(b). Under

the law of the parties, "[a] person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both." *Id.* § 7.01(a); *Adames v. State*, 353 S.W.3d 854, 862 (Tex. Crim. App. 2011). Culpability under the law of the parties does not distinguish between principals or accomplices. *See* Tex. Penal Code Ann. § 7.01(c). A person is criminally responsible for an offense committed by the conduct of another if "acting with the intent to promote or assist in the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense[.]" *Id.* § 7.02(a)(2); *Adames*, 353 S.W.3d at 862.

"'Evidence is sufficient to convict under the law of parties where the defendant is physically present at the commission of the offense and encourages its commission by words or other agreement.'" *Salinas v. State*, 163 S.W.3d 734, 739 (Tex. Crim. App. 2005) (quoting *Ransom v. State*, 920 S.W.2d 288, 302 (Tex. Crim. App. 1994)). Party participation may be shown by events occurring before, during, and after the commission of the offense, and may be demonstrated by actions showing an understanding and common design to do the prohibited act. *Id.* at 739-40.

Analysis

In one issue on appeal, Dotson challenges the sufficiency of the evidence supporting the jury's guilty verdict. According to Dotson, the State failed to establish

the elements in the indictment to prove that Dotson committed murder beyond a reasonable doubt. Dotson argues that the evidence presented by the State was disputed by Dotson throughout the trial and that evidence "included confusing evidence, contradictory evidence, speculation, outlandish opinions by investigators, and evidence that refuted the allegations of the State." Dotson asserts that the State failed to show that the combined and cumulative weight of the evidence, furnished by non-accomplice witnesses, tended to connect Dotson to Wagner's murder.

It is undisputed that Wagner was shot and killed on January 30, 2022, at the Beaumont Heights apartment complex in Jefferson County, and that Wagner died from gunshot wounds. The jury heard Officer Hodges testify it looked like someone "had something out for Mr. Wagner [and it] looked like [Wagner] was being hunted just from the amount of shell casings that were observed[]" near Wagner's body, and that no gun was found on Wagner's body. Officer Boseman testified that, based on the pattern of the shell casings found and the position of Wagner's body on the ground, it appeared that Wagner was running as he was being shot at, and he did not see the shots coming towards him. Lieutenant Reynolds testified that Wagner was fired at by multiple weapons of varying calibers—a .40 caliber, .45 caliber, and 9-millimeter.

Even ignoring Cole's accomplice witness testimony, other evidence connected Dotson to Wagner's murder. The jury heard witnesses testify as to the

conflict between Wagner and Perkins, and the jury heard testimony that Perkins had admitted that he had orchestrated the aggravated assault against Wagner on January 24, 2022, that Perkins had exchanged text messages and phone calls with Dotson before, during, and after the shooting, that at least one of the same firearms had been used in both the January 24, 2022 shooting and the January 30, 2022 murder of Wagner, and that Perkins and Dotson were seen together at the time of the shooting and were together after the shooting. Tina testified that she overheard either Dotson or Perkins talking about how, in the January 24, 2022 shooting Wagner had run away, was "sliding all in the mud[,]" and trying to avoid the gunshots, and that she believed, based on their conversation, that both Dotson and Perkins were there. Law enforcement determined that the shooting occurred around 11:57 p.m. on January 30, 2022. Before the time of the shooting, video surveillance footage at the complex depicted a newer Hyundai Sonata backing into a parking spot at the complex with headlights on, and a person can be seen getting out and walking through the complex. The camera footage shows the vehicle was parked as of 11:55 p.m., and then a person can be seen getting back inside the vehicle close to the time of the shooting, and the vehicle is driven away around 12:13 a.m. on January 31, 2022. The jury also had Detective Freeman's analysis of the phone extraction of Perkins's and Dotson's phones. The analysis showed that Perkins and Dotson frequently contacted each other from January 19, 2022, through January 31, 2022. Freeman's analysis also

37

showed several calls between their phones several times after 11 p.m. on January 30, 2022, and into the morning of January 31, 2022. Evidence was presented that at the time of the murder, both Dotson's and Perkins's phones used the same cell tower that serviced the area for the Beaumont Heights complex. The jury was presented with evidence that, around noon or 1 p.m. on January 31, 2022, hours after the murder, a traffic stop was conducted on Tina's 2011 Hyundai Sonata and Perkins and Dotson were inside the car.

The jury heard officers Smith and Wilson testify that a .45 caliber casing that came from the scene of Wagner's murder was connected to the prior shooting that occurred on January 24th on Grand Street, which had also targeted Wagner. Also, a .223 caliber firearm was recovered on February 11, 2022, from the scene of a shooting that involved Dotson and another individual, and the firearm matched a shell casing collected from Wagner's murder scene. The jury could have considered Detective Smith's testimony that, based on the summary of the phone calls between Perkins and Dotson the night of the murder and a message on Perkins's phone showing Cole called him about one hour before the murder, and based on Detective Smith's training and experience, Detective Smith believed that Perkins and Dotson worked together in carrying out the homicide and that they acted intentionally and knowingly together to kill Wagner. Detective Smith recalled that Perkins said that

he and Dotson were at Beaumont Heights on the night of Wagner's murder, and later Perkins had admitted to trying to kill Wagner on a prior occasion.

On this record, we conclude that a rational juror could have found that the non-accomplice evidence sufficiently tends to connect Dotson to Wagner's murder. *See Smith*, 332 S.W.3d at 442; *Simmons*, 282 S.W.3d at 508; *Solomon*, 49 S.W.3d at 361-62; *see also generally* Tex Code Crim. Proc. Ann. art. 38.14. The jury could have made reasonable inferences from the evidence and concluded that the evidence showed beyond a reasonable doubt that Dotson intentionally and knowingly caused Wagner's death by shooting Wagner with a firearm. *See Hooper*, 214 S.W.3d at 15; *see also* Tex. Penal Code Ann. § 19.02(b)(1). After reviewing all the evidence and viewing the evidence in the light most favorable to the verdict, we conclude that a rational factfinder could have found the essential elements beyond a reasonable doubt necessary to conclude that Appellant was criminally responsible either as a principal or under the law of parties for the offense of murder as charged in the indictment. *See Jackson*, 443 U.S. at 319; *Hooper*, 214 S.W.3d at 13; *Salinas*, 163 S.W.3d at 739-40. We overrule Appellant's issue, and we affirm the trial court's judgment.

AFFIRMED.

LEANNE JOHNSON
Justice

Submitted on September 30, 2025
Opinion Delivered October 22, 2025
Do Not Publish

Before Golemon, C.J., Johnson and Chambers, JJ.